In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-99-00186-CR


______________________________




BOBBY JOE ELLISON, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 124th Judicial District Court


Gregg County, Texas


Trial Court No. 27,067-B




 




Before Grant, Ross and Cornelius,* JJ.


Opinion by Justice Cornelius



_____________________________________

*William J. Cornelius, Chief Justice, Retired, Sitting by Assignment


O P I N I O N



 This case is before us on remand from the Texas Court of Criminal Appeals. In our prior
decision, we affirmed Ellison's conviction for aggravated robbery, but remanded the case to the
district court for a new trial on punishment because the trial court failed to sua sponte instruct the
jurors that, before they could consider certain prior offenses and bad acts allegedly committed by
Ellison, they must find beyond a reasonable doubt that Ellison actually committed those acts. See
Ellison v. State, 51 S.W.3d 393 (Tex. App.-Texarkana 2001), rev'd, 86 S.W.3d 226 (Tex. Crim.
App. 2002). The Court of Criminal Appeals reversed our decision because we used an improper
analysis in determining whether the trial court's error was harmful.

 At the punishment stage of Ellison's trial, the State introduced evidence of certain prior
offenses and bad acts committed by Ellison, and in questions on cross-examination of defense
witnesses the prosecutor referred to other crimes and bad acts allegedly committed by Ellison. 
Reference to all of these crimes and bad acts was made under the authority of Tex. Code Crim.
Proc. Ann. art. 37.07, § 3(a) (Vernon Supp. 2003). These other crimes and bad acts included a
driving while intoxicated conviction in Rusk County; the burglary of a constable's car in Blanco
County and the theft of a pistol and a rifle; various instances of possessing and using drugs, including
marihuana, powder cocaine and crack cocaine, methamphetamine, and alcohol; attempted burglary
of an Automated Teller Machine (ATM) in Gregg County; and a driving while intoxicated charge
in Missouri. Although Ellison did not testify personally at the trial, he did not dispute that he
committed these specific offenses and acts, and in fact, several of his defense witnesses conceded
that he had done them. The State also produced two Federal Bureau of Investigation (FBI) agents
who testified to statements that Ellison had made in a videotaped interview before trial. The
videotaped interview was six to seven hours long, so the State and defense counsel agreed at trial
that the FBI agents could testify to their recollection of Ellison's statements in the interview rather
than having to play all of the videotapes at the trial. The agents testified that Ellison was given
Miranda (1) warnings before the interview and that all requirements of Texas and federal law were
complied with in order to make Ellison's statements admissible in evidence.

 One of the FBI agents testified that he mostly worked on investigating violent crimes, which,
among other things, include carjackings, bank robberies, kidnappings, and fugitive cases. He said
one of his jobs was working domestic terrorism cases, that such cases can be white hate crimes, and
he referred to the Oklahoma City bombing case as an example of a domestic terrorism case. The
agent testified that, in the videotaped interview of Ellison, Ellison admitted that he had participated
in hate crimes and that he had a relationship with the Aryan Brotherhood. The agent said that Ellison
spoke about several events in which he participated with the Aryan Brotherhood in several different
states and that they included several acts of violence. The agent said Ellison admitted participating
in various hate crimes in North Carolina and Missouri as a participant with the Aryan Brotherhood. 
The other FBI agent testified he heard Ellison's videotaped interview, and he was able to confirm the
truth of some of Ellison's statements about specific offenses he committed, but none of these
confirmations related to Ellison's Aryan Brotherhood connection or to his commission of hate
crimes.

 In addition, the State, in cross-examining Ellison's former employer, who testified for the
defense, asked the witness if Ellison had told him he was a member of the Aryan Brotherhood and
if he had told him he had shot a "black man" in the face. When the witness answered "no" and said
that Ellison, as far as he knew, was a nice man, the prosecutor asked the witness, "do nice guys
randomly execute or attempt to execute black people because of the color of their skin?" The former
employer told the prosecutor that Ellison never told him the things that he had mentioned. The State
asked another defense witness who testified in Ellison's behalf whether she knew if Ellison was a
member of the Aryan Brotherhood, and she answered, "No." The State questioned Ellison's mother
on cross-examination if she knew anything about her son's involvement in a hate group, specifically
the Aryan Brotherhood, and she said, "No," but said Ellison told her one time there was no hope for
him because he had "sold his soul to the devil."

 The State argues that Ellison admitted all the bad acts and offenses referred to at the
punishment hearing, so the lack of a reasonable doubt instruction did not harm him. Ellison, through
his witnesses, did admit the DWIs, the burglary and theft, and the drug and ATM offenses. But as
to his association with hate groups such as the Aryan Brotherhood and terrorist groups, Ellison did
not admit in court that they were true; rather, the FBI agents testified that Ellison admitted to them
in his out-of-court videotaped interview, which was not introduced in evidence at trial, except
through the agents' testimony. Ellison's defense counsel tried to prove that Ellison's statements in
the interview about these matters were untrue and that Ellison made them only to please the FBI
agents so they would give him cigarettes and food during the long interview. In addition, defense
counsel vigorously argued to the jury that it was unreasonable to believe Ellison would belong to a
racist terrorist group considering that he has had a long and cordial relationship with African-Americans, and his girlfriend of long-standing has a child who is half African-American.

 The State cites us to several cases where the courts have held that the failure to give the
reasonable doubt instruction at the punishment phase of the trial was not harmful. See Allen v. State,
47 S.W.3d 47 (Tex. App.-Fort Worth 2001, pet. ref'd); Brown v. State, 45 S.W.3d 228 (Tex.
App.-Fort Worth 2001, pet. ref'd); Martin v. State, 42 S.W.3d 196 (Tex. App.-Fort Worth 2001, pet.
ref'd); Frazier v. State, 15 S.W.3d 263 (Tex. App.-Waco 2000, no pet.). But in all these cases, the
prior offenses and bad acts of the defendant were proven by overwhelming evidence and were largely
undisputed. That is not the case here. While many of the acts alleged against Ellison were
undisputed, his engagement in hate crimes and involvement in hate and terrorist group activities
were not undisputed. 

 The standard for determining harm in cases like this is whether the appellant has suffered
egregious harm because of the lack of the reasonable doubt instruction. In deciding that issue, we
must try to illuminate the actual, not just the theoretical, harm to Ellison, and therefore, we must
assess the degree of harm in the light of the entire jury charge, the state of the evidence, including
contested issues and the weight of the probative evidence, the argument of counsel, and all other
relevant information revealed by the record as a whole. Ellison v. State, 86 S.W.3d 226.

 We noted in our prior opinion that the highly inflammatory and prejudicial nature of the
disputed conduct by Ellison likely had a serious influence on the jury's assessment of punishment. 
It is also likely, we believe, that the jury was more prone to give consideration and weight to these
disputed extraneous activities in the absence of an instruction that they must find them true beyond
a reasonable doubt, than they would have if such an instruction had been given. Because of this, we
find that the failure to give the instruction in this case at the punishment stage caused Ellison
egregious harm.

 For the reasons stated, we reverse the judgment as to punishment only and remand the case
to the trial court for a new trial on punishment. Because we are requiring a new trial on punishment,
we need not discuss Ellison's contention that he received ineffective assistance of counsel at the
punishment phase.





 The conviction is affirmed, but the judgment on punishment is reversed and the cause is
remanded to the trial court for a new trial on punishment only.


 William J. Cornelius*

 Justice


Date Submitted: December 23, 2002

Date Decided: January 8, 2003


Publish


*Chief Justice, Retired, Sitting by Assignment
1. Miranda v. Arizona, 384 U.S. 436 (1966).



n team" entered Joseph's cell and removed
the weapon. Jeffrey Butler, an investigator with the Texas Department of Criminal Justice (TDCJ)
who works at the Telford Unit, testified it was illegal for Joseph to possess the shank officers seized
from his cell. Brian Collins, another officer with TDCJ, described the weapon as "a stabbing device
made of Plexiglas with a newspaper handle." Collins also opined, based on his training and
experience as a corrections officer, that the sole purpose of Joseph's weapon "would be to hurt,
maim, or kill someone." 
            Joseph did not testify, nor did he present any additional evidence to the jury. 
            A person is prohibited from intentionally, knowingly, or recklessly possessing a deadly
weapon in a penal institution. Tex. Pen. Code Ann. § 46.10. Viewing the evidence in the light
most favorable to the verdict, a rational jury could have found the State proved the essential elements
of the charged offense beyond a reasonable doubt. See Dunn v. State, 125 S.W.3d 610, 616 (Tex.
App.—Texarkana 2003, no pet.). 
            There are two ways in which we may find the evidence to be factually insufficient. Zuniga
v. State, No. 539-02, 2004 Tex. Crim. App. Lexis 668, at *20 (Tex. Crim. App. Apr. 21, 2004). 
First, if the evidence supporting the verdict, considered alone, is too weak to support the jury's
finding of guilt beyond a reasonable doubt, then we must find the evidence insufficient. Id. Second,
if—when we weigh the evidence supporting and contravening the conviction—we conclude that the
contrary evidence is strong enough the State could not have met its burden of proof, we must find
the evidence insufficient. Id. "Stated another way, evidence supporting guilt can 'outweigh' the
contrary proof and still be factually insufficient under a beyond-a-reasonable doubt standard." Id. 
If the evidence is factually insufficient, then we must reverse the judgment and remand for a new
trial. Clewis v. State, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996). 
            In this case, the evidence supporting the verdict, when considered alone, is not too weak to
support the jury's finding of guilt beyond a reasonable doubt. Nor is the evidence supporting the
jury's verdict outweighed by evidence contravening the jury's verdict. Considering all the evidence
in a neutral light, we believe the jury was rationally justified in finding guilt beyond a reasonable
doubt. 
            At the sentencing hearing, Joseph pled "true" to having been convicted of two prior felony
offenses. His plea enhanced the punishment range for his offense to imprisonment for no less than
twenty-five years or more than ninety-nine years or life. See Tex. Pen. Code Ann. § 12.42(d)
(Vernon Supp. 2004). The trial court reviewed Joseph's lengthy disciplinary history while in prison,
the circumstances of the present offense, and the seriousness of his prior crimes (including one
conviction for attempted capital murder), and concluded the appropriate punishment in this case was
ninety-nine years. The punishment assessed in this case was within the range of punishment
permitted under Texas law. Accordingly, we affirm the trial court's judgment.



                                                                        Jack Carter
                                                                        Justice

Date Submitted:          May 6, 2004
Date Decided:             May 11, 2004

Do Not Publish